UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| KADA CACKOVIC, | ) | |
|---|---|---|
| Plaintiff, | ) ) ) | Case No. 12-cv-07386 |
| v. | ) ) | Judge John W. Darrah |
| HRH CHICAGO, LLC, (d/b/a/ HARD ROCK HOTEL) (a/k/a HRH MANAGEMENT (CHICAGO) LLC), *an Illinois limited liability corporation*, | ) ) ) ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Kada Cackovic brings this action against her former employer, HRH Chicago, LLC, d/b/a Hard Rock Hotel ("HRH"), alleging disability and national origin discrimination, in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* (the "ADA") and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"). HRH has moved for summary judgment on Plaintiff's Complaint, and the matter has been fully briefed.

## LOCAL RULE 56.1

Local Rule 56.1 "is designed, in part, to aid the district court, 'which does not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information,' in determining whether trial is necessary." *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011) (internal citation omitted). Local Rule 56.1(a)(3) requires the party moving for summary judgment to provide "a statement of material facts as to which the moving party contends there is no genuine issue."

Rule 56.1(b)(3) then requires the nonmoving party to admit or deny each factual statement proffered by the moving party and, in the case of any disagreement, to specifically reference the "affidavits, parts of the record, and other supporting materials relied upon." *See Schrott v. Bristol-Myers Squibb Co.*, 403 F.3d 940, 944 (7th Cir. 2005). Rule 56.1(b)(3)(C) further permits the nonmovant to submit additional statements of material facts that "require the denial of summary judgment."

A litigant's failure to dispute the facts set forth in its opponent's statement in the manner required by Local Rule 56.1 deems those facts admitted for purposes of summary judgment. *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003); *see also Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 527 (7th Cir. 2000) (the district court has discretion to require strict compliance with its local rules governing summary judgment). Accordingly, to the extent that a response to a statement of material fact provides only extraneous or argumentative information, this response will not constitute a proper denial of the fact, and the fact is admitted. *See Graziano v. Vill. of Oak Park*, 401 F. Supp. 2d 918, 937 (N.D. Ill. 2005). Similarly, to the extent that a statement of fact contains a legal conclusion or otherwise unsupported statement, including a fact that relies upon inadmissible hearsay, such a fact is disregarded. *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997).

## BACKGROUND

Unless otherwise noted, the following facts are undisputed. Cackovic is a female citizen of the United States who resides in Chicago and who is originally from Bosnia. (Def's L.R. 56.1 Stmt. of Undisputed Material Facts ("SOF") ¶ 2.) HRH is an Illinois corporation that does business as the Hard Rock Hotel in Chicago. (*Id*. ¶ 1.)

2

*Cackovic's Employment at the Hard Rock Hotel*

In 2008, Cackovic began working as a housekeeper at the Hard Rock Hotel, cleaning rooms on the morning shift. In 2010, she was transferred to the evening shift, from 3:00 p.m. to 11:30 p.m., because the morning shift was too demanding for her. (*Id.* ¶ 7; Pl.'s Stmt. of Additional Facts ("PSAF") ¶ 3.) Cackovic was the only Bosnian on the evening shifts, although there were other Bosnians on the morning shift. (PSAF ¶ 1; *see also* Def.'s Resp. to PSAF ¶ 1.) Cackovic, along with other housekeepers, were given a half-hour lunch break and two 15-minute breaks. (SOF ¶ 8.) The housekeepers were not permitted to take breaks in the hotel guest rooms. (*Id.* ¶ 11.)

In 2012, Cackovic's supervisor was Anetka Baker, who oversaw the housekeepers' breaks. (*Id.* ¶ 9.) When it was busy at the hotel, Baker would determine when the housekeepers would take their break, and, when it was not as busy, the housekeepers would let Baker know when they were going to take their breaks. (*Id.* ¶ 10; *see also* Pl.'s Resp. to SOF ¶ 9; *see also* SOF, Tab C, Cackovic Dep., p. 54 and Tab F, Baker Dep. p.17.) Cackovic testified first that she would tell Baker "every time" before she took a break, but then later testified that she did not tell Baker when she took an emergency break. (SOF ¶ 10; *see also* Pl.'s Resp. to SOF ¶ 10; SOF, Tab C, Cackovic Dep., p. 54 and 105-106.) Baker testified that sometimes, Cackovic would not tell her when she was taking a break. (Pl.'s Resp. to SOF ¶ 10.) Baker did not have the authority to suspend or terminate Cackovic. (SOF ¶ 71.)

In her deposition, Cackovic testified that Baker made negative comments to Cackovic and other Bosnian employees, including that Bosnians contaminate this country, take jobs away from Americans and African-Americans, and that it was difficult to communicate with them. (PSAF ¶¶ 4-5.) Cackovic testified that Baker kept a close eye on her and gave her so much work

that Cackovic could not finish it all. (PSAF ¶ 8; Def's Resp. to PSAF ¶ 8.) Cackovic also testified that another Bosnian housekeeper named Dzemila could not stand Baker's disparaging remarks and treatment and "was forced to quit her job." (PSAF ¶ 7; SOF Tab C, Cackovic Dep. p. 81-82.) Cackovic complained about Baker to human resources. (PSAF ¶¶ 9-10; Def's Resp. to PSAF ¶¶ 9-10.) Cackovic further testified that an African-American housekeeper named Sabina would come to work, clean three rooms, stop working and spend the rest of her time talking with Baker and drinking coffee. (PSAF ¶ 11; Def's Resp. to PSAF ¶ 11; *see also* SOF, Tab C, Cackovic Dep. p. 84.)

*Cackovic's Health Conditions*

Cackovic first began seeing Dr. Milenko Lazarevic in 2006 and was treated for anxiety. She was diagnosed with diabetes in 2009. (SOF ¶ 13.) Dr. Lazarevic testified that Cackovic's conditions did not prevent her from doing any type of activity and that he did not recall her telling him anything about her work. (*Id.* ¶¶ 14-15.) Cackovic testified that when she is very busy and working hard physically, her blood sugar very often will drop down. (*Id.* ¶ 17.) When her blood sugar drops down, she becomes sick and has to consume juice and chocolate and stay in place for at least 15 to 20 minutes to get her strength back. (*Id.* ¶ 18; *see also* PSAF ¶ 13.) Cackovic also takes medication for her anxiety disorder, and, if she does not take it for two to three days, she feels depressed and anxious and cannot function mentally or normally. (SOF ¶ 19; PSAF ¶ 14.) She testified that she would get stressed if Baker or her previous supervisor, Irene Golub, bothered her. (SOF ¶ 21; *see also* Pl.'s Resp. to SOF ¶ 21.) She told her supervisor of her anxiety issues and requested easier work because of it. (PSAF ¶16.) Cackovic testified that she functions okay in everyday life as long as she takes her pills. (SOF ¶ 23.)

4

Baker knew that Cackovic had diabetes and that she would get dizzy when her blood sugar was up or down. Baker would tell Cackovic to just take a break and sit for 15 minutes to see how she feels. Baker testified that this would be an extra break in addition to Cackovic's regular breaks. (SOF ¶¶ 25-26.) Baker never denied Cackovic a break or disciplined her for taking too many breaks. (PSAF ¶ 19.)

*Events of February 17, 2012*

On February 17, 2012, Baker assigned Cackovic to do a pickup in rooms 310 and 311, both of which had vomit in them, and to check if the carpets had been cleaned yet. (SOF ¶ 36.) Cackovic checked on room 310 around 3:30 p.m., noticed it smelled of vomit and let Baker know that nothing could be done in the room. (SOF ¶ 37.) Baker testified that she and Cackovic argued when Baker asked Cackovic to help out another housekeeper and that Cackovic told Baker to shut up and left her office. (SOF ¶ 38.) Baker further testified that Cackovic did not answer Baker's calls on her radio that night, except one time when Baker told her to bring towels to a guest. (SOF ¶ 39; *see also* P's Resp. to SOF ¶ 39; SOF, Tab F, Baker Dep., p.55.)

Early in the evening, Baker noticed Cackovic's cleaning cart in room 310, but did not see Cackovic in the room. (SOF ¶ 41.) Later, Baker noticed that she did not see Cackovic's cart on the floor and did not know where Cackovic was. (*Id.* ¶ 42.) Baker asked a security guard if he had seen Cackovic go out for a smoke break, and he said no. (*Id*. ¶ 43.) Baker then called the front desk manager, Mallory Guimond, and a security guard named Tony Scialabba to look for Cackovic in room 310. (*Id.* ¶ 44; *see also* SOF, Tab F, Baker Dep. pp. 24-25, 30-31.)

When Baker, Guimond, and Scialabba went to room 310, Baker's and Scialabba's key cards would not allow them to enter the room. (SOF ¶ 45.) Baker testified that the door gave a beeping sound that indicated it was double-locked from the inside with the deadbolt. (SOF

5

¶ 45.) Cackovic disputed that she locked the door with the deadbolt; however, she also testified that she did not remember all the details of the night. (SOF ¶ 53.) Baker then knocked loudly on the door, and Cackovic came out of the room. (SOF ¶¶ 45-46.) Baker testified that she asked Cackovic why she was in the room with the door locked and that Cackovic asked why Baker did not call her on her cell phone. (SOF ¶ 48.) Cackovic, however, testified that she did not remember saying anything to Baker. (Pl.'s Resp. to SOF ¶ 48; SOF, Tab C, Cackovic Dep. p. 109.)

Baker, Guimond, and Cackovic then went to an office to discuss the incident, and Baker told Cackovic she was being sent home for the night. (SOF ¶ 50.) Cackovic then told them that she had not been feeling well, and Guimond asked her why she had not told Baker so that she could have a break. (*Id.* ¶ 51; PSAF ¶ 20.) Cackovic was sent home about 9:15 p.m. (SOF ¶ 56.) In her deposition, Cackovic testified that she entered room 310 because she was not feeling well and that she was in the room for about 10 minutes. (SOF ¶¶ 52-53.) She acknowledged that she did not tell Baker she was going to room 310 to take a break and stated that she did not use her radio because she was going into a diabetic coma. (SOF ¶¶ 27, 54-55.)

Cackovic was treated by Dr. Lazarevic the following day, February 18, 2012. In his deposition, Dr. Lazarevic stated that the only written notes he had from that visit stated that Cackovic was suffering from strong low back pain. (SOF ¶ 29; Pl.'s Resp. to SOF ¶ 29.) He prescribed her medication for the back pain and also provided her with a new prescription for diabetes. (SOF ¶ 30; Pl.'s Resp. to SOF ¶ 30.) Dr. Lazarevic further testified that Cackovic did not mention any problems at work and that, if she had gone into a diabetic coma on February 17, 2012, she would not have been able to walk into his office the next day. (SOF ¶¶ 31, 33.)

Later on the same day, after her doctor's appointment, Cackovic went to work. (SOF ¶ 57.) She presented a note from Dr. Lazarevic, which stated that she had a history of severe diabetes and anxiety disorder and that her blood sugar and pressure had increased. (SOF ¶ 35.) Cackovic then had two days off. (SOF ¶¶ 58-59.)

Hard Rock Hotel's director of human resources, Maria Izokaitis, along with director of housekeeping Karolina Swierk, subsequently conducted an investigation of the incident. (SOF ¶ 59.)[1] Izokaitis has the responsibility for investigating certain employee issues and, at times, the responsibility for terminating employees. (SOF, Tab E, Izokaitis Aff., ¶ 3.). As part of her investigation, Izokaitis reviewed memos prepared by Guimond and Baker and an incident report prepared by security by Scialabba about the events of February 17, 2012. (SOF ¶ 60.) All three documents were consistent with the account that Guimond, Baker and Scialabba went to room 310 at approximately 8:30 p.m. to look for Cackovic, found it locked with the deadbolt, and Cackovic then opened the door herself. (SOF ¶¶ 61-67.)

---

[1] Cackovic moved to strike Izokaitis's entire affidavit, arguing that it is not based on Izokaitis's personal knowledge and that the documents she relies upon do not comply with Federal Rule of Evidence 803(6). In response, HRH argued that Izaikitis's affidavit is based on her personal knowledge of what she did as director of human resources to investigate the claims and why she terminated Cackovic. HRH further argued that the documents relied on by Izokaitis are admissible as business records that were kept in the ordinary course of business. The Court denied Cackovic's motion to strike but stated it would consider the motion when ruling on summary judgment.
    The Court holds that Izokaitis's affidavit is based on her personal knowledge and that the documents relied upon are not inadmissible hearsay because they qualify as business records under FRE 803(6). Additionally, Izokaitis's affidavit is offered to explain why Izokaitis terminated Cackovic and not for the truth of the matter asserted, and therefore, is not inadmissible hearsay. Cackovic also disputes some of HRH's statements of fact solely on the basis that Izokaitis's affidavit is inadmissible and she does not offer other evidence to dispute those facts. (*See, e.g.,* Pl's Resp. to SOF ¶¶ 59-70.) Because the Court holds that Izokaitis's affidavit was properly relied upon by HRH, those facts are deemed admitted.

Scialabba's incident report further noted that he completed a lock interrogation for room 310, which uses security technology to provide information about the key card and deadbolt activity for the lock to a room. (SOF ¶ 68.) Scialabba reported that Cackovic's key card accessed the room at 6:30 p.m., that the deadbolt was thrown at 6:30 p.m. and that it was released at 7:13 p.m. Cackovic's key card accessed room 310 again at 7:48 p.m., and the deadbolt was thrown at 7:49 p.m. The deadbolt was then released at 8:41 p.m. (SOF ¶ 68.)

Izokaitis and Swierk interviewed Cackovic on either February 21 or 22, 2012, regarding February 17, 2012. During the meeting, Cackovic told them that she did not have much work to do so she stayed in room 310 because she did not want to be sent home early. She acknowledged that she knew that she was not supposed to be in the room and that breaks should be taken in the break room. (SOF ¶ 69.)

On February 22, 2012, Izokaitis decided to terminate Cackovic for violating company policy. According to her affidavit, Izokaitis identified the following reasons for Cackovic's termination: lying about how long she was in the guest room; unauthorized absence from her work station; excessive breaks; accessing a guest room for a non-work related purpose/hiding in guest room; taking a cart inside the room; locking the door from the inside and not answering the door when her supervisor knocked; telling her supervisor to shut up; and admitting to hiding in the guest room. (SOF ¶ 70.)

Cackovic did not tell Izokaitis that she was in room 310 because she was ill until after Izokaitis informed her she was being terminated. (SOF ¶ 73.)

8

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying the evidence it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). If the moving party meets this burden, the nonmoving party cannot rest on conclusory pleadings but "must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial." *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 596 (7th Cir. 1995) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986)). A mere scintilla of evidence is not sufficient to oppose a motion for summary judgment; nor is a metaphysical doubt as to the material facts. *Robin v. ESPO Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000) (citations omitted). Rather, the evidence must be such "that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica, Ind.*, 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

In considering a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005) (citing *Anderson*, 477 U.S. at 255). The court does not make credibility determinations or weigh conflicting evidence. *Id.*

## ANALYSIS

A plaintiff may prove discrimination under Title VII and the ADA through the direct or the indirect burden-shifting methods of proof. *Dickerson v. Bd. of Trs.*, 657 F.3d 595, 601 (7th

Cir. 2011); *Winsley v. Cook Cnty.*, 563 F.3d 598, 604 (7th Cir. 2009). Under the direct method, the plaintiff must show, either through direct or circumstantial evidence, that her employer's unlawful discrimination caused her to suffer an adverse job action. *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 938-39 (7th Cir. 2003). Direct evidence is rare and "essentially requires an admission by the decisionmaker" of discrimination. *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003) (internal citations and quotations omitted). Circumstantial evidence must be sufficient to create "a convincing mosaic of discrimination," which would permit a jury to infer intentional discrimination. *Adams*, 324 F.3d at 939. Such a mosaic can be established through proof of "suspicious timing, ambiguous oral or written statements, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." *Dass v. Chicago Bd. of Educ.*, 675 F.3d 1060, 1071 (7th Cir. 2012). Where the plaintiff relies on circumstantial evidence, however, that evidence "must point directly to a discriminatory reason for the employer's action" and "be directly related to the employment decision." *Id.*

Under the indirect method, known as the *McDonnell Douglas* test, a plaintiff may establish a *prima facie* case of discrimination through competent evidence that: (1) she belonged to a protected class; (2) she performed her job satisfactorily so as to meet her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) her employer treated similarly situated employees outside of the protected class more favorably. *Weber v. Univs. Research Ass'n*, 621 F.3d 589, 593 (7th Cir. 2010); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). If the plaintiff satisfies this burden, the employer then has the burden to articulate a legitimate, nondiscriminatory reason for its decision. *Id*. at 593. The

plaintiff may then challenge that reason as a pretext for discrimination. *Id.*; *see also Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559, 563 (7th Cir. 2009).

Regardless of whether a plaintiff proceeds under the direct or indirect method of proof, the Seventh Circuit has observed that the fundamental question at the summary judgment stage is "whether a reasonable jury could infer prohibited discrimination." *Perez v. Thorntons, Inc.*, 731 F.3d 699, 703 (7th Cir. 2013); *see also Coleman v. Donahoe*, 667 F.3d 835, 863 (7th Cir. 2012) (Wood, J., concurring) ("By now . . . the various tests that we insist lawyers use have lost their utility . . . . In order to defeat summary judgment, the plaintiff one way or the other must present evidence showing that she is in a class protected by the statute, that she suffered the requisite adverse action . . . , and that a rational jury could conclude that the employer took that adverse action on account of her protected class, not for any non-invidious reason.").

*Direct Evidence of National Origin Discrimination*

Cackovic argues that she has established a convincing mosaic of circumstantial evidence of discrimination on the basis of her national origin. She relies on her testimony that Baker made disparaging comments about Bosnians to Cackovic and to another Bosnian housekeeper named Dzemila.[2]

"[I]solated comments that are no more than 'stray remarks' in the workplace are insufficient to establish that a particular decision was motivated by discriminatory animus." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007) (quoting *Merillat v. Metal Spinners, Inc.*, 470 F.3d 685, 694 (7th Cir. 2006) (other internal citation omitted)). Rather,

---

[2] Cackovic also claims that Baker gave Bosnian housekeepers more work than they could finish but has not provided any evidentiary support for that claim. Therefore, this claim will be disregarded.

11

as Cackovic acknowledges, for disparaging remarks to constitute direct evidence of discrimination, the remarks must be: (1) made by the decision-maker; (2) close in time to the decision; and (3) related to the adverse employment action. *Egonmwan v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 845, 850 (7th Cir. 2010) (citing *Hemsworth*, 476 F.3d at 491). As the Seventh Circuit has stated, bigotry "is actionable only if it results in injury to a plaintiff; there must be a real link between the bigotry and an adverse employment action." *Gorence v. Eagle Food Ctrs.*, 242 F.3d 759, 762 (7th Cir. 2001).

Baker's alleged disparaging remarks do not meet any of these three elements. First, Izokaitis, not Baker, was the decision-maker. Second, Cackovic has not provided any testimony about when Baker made these comments, including whether they were close in time to her firing. *See, e.g.*, *Petts v. Rockledge Furniture LLC*, 534 F.3d 715, 722 (7th Cir. 2008) (collecting cases and finding a gap of three months insufficient to create a reasonable inference of discrimination). Third, Cackovic has not provided any evidence that these comments relate to her firing. Therefore, Baker's remarks, taken alone, do not constitute direct evidence of discrimination.

In an attempt to link Baker's remarks to Izokaitis's actions, Cackovic argues that the "cat's paw" theory of liability applies to her case. This liability arises when "a biased subordinate who lacks decision-making power uses the formal decision maker 'as a dupe in a deliberate scheme to trigger a discriminatory employment action.'" *Johnson v. Koppers, Inc.*, 726 F.3d 910, 914 (7th Cir. 2013) (quoting *Smith v. Bray*, 681 F.3d 888, 897n3 (7th Cir. 2012)). This theory "requires both evidence that the biased subordinate actually harbored discriminatory animus against the victim of the subject employment action, and evidence that the biased subordinate's scheme was the proximate cause of the adverse employment action." *Johnson*, 726 F.3d at 914; *see also Staub v. Proctor Hospital*, 131 S.Ct. 1186, 1194 (2011) (employer may

be liable for discrimination if a non-decision maker "performs an act motivated by (discriminatory) animus that is intended . . . to cause an adverse employment action, and . . . that act is a proximate cause of the ultimate employment action."). Discriminatory statements by the subordinate "may be probative of intentional discrimination if that individual exercised a significant degree of influence over the contested decision." *Sun v. Bd. of Trs.*, 473 F.3d 799, 813 (7th Cir. 2007).

Cackovic argues that Izokaitis, the decision-maker, relied upon and was heavily influenced by the actions and statements of Baker in firing Cackovic. HRH does not dispute that Izokaitis relied on Baker's account of February 17, 2012 in deciding to terminate Cackovic, but notes that besides Baker, Izokaitis also considered three other accounts from different sources – Guimond, Scialabba, and Izokaitis's own interview with Cackovic. In view of the different sources considered by Izokaitis, HRH argues it is clear that Baker did not exercise a significant degree of influence over Izokaitis's decision to fire Cackovic. Furthermore, HRH argues that there is no evidence that Baker was motivated by improper animus in providing Izokaitis with her account of February 17, 2012.

Cackovic has not presented evidence that Baker's discriminatory animus was the proximate cause of Izokaitis's decision to terminate Cackovic. As such, the cat's paw theory does not apply to her case. *See Harris v. Warrick Cnty. Sheriff's Dep't*, 666 F.3d 444, 448 (7th Cir. 2012) (rejecting plaintiff's use of the cat's paw theory because there was no connection between plaintiff's co-worker's allegedly improper conduct and his termination). In other words, a reasonable jury could not find that Izokaitis was Baker's "dupe" in firing Cackovic. *See Johnson*, 726 F.3d at 914. As mentioned above, apart from Baker, Izokaitis relied on information from Guimond and Scialabba, both of whose accounts were consistent with Baker's

and neither of whom Cackovic claims had any animus towards her. Izokaitis also relied on Cackovic's version of the events.

Although Cackovic relies on *Paz v. Wauconda Healthcare & Rehab. Center, LLC*, 464 F.3d 659 (7th Cir. 2006), that case is easily distinguishable from the present one. In *Paz*, the plaintiff's supervisor made racially-disparaging remarks, treated all Hispanics less favorably, repeatedly suggested that the plaintiff, who was pregnant, get an abortion, and was the one who decided to fire the plaintiff. *Id.* at 666. Here, unlike *Paz*, there is no evidence of any racial animus by the decision-maker, Izokaitis. Likewise, there is no genuine issue of material fact that Baker's racial animus was the proximate cause of Cackovic's termination. Consequently, Cackovic has not presented "a convincing mosaic" of evidence that she was fired because of her national origin.

*Indirect Discrimination Based on National Origin*

Since she cannot prevail under the direct method, Cackovic must establish all four elements of a *prima facie* case of national origin discrimination under the indirect method of proof. *See Weber*, 621 F.3d at 593. It is undisputed that Cackovic has satisfied the first and third *McDonnell Douglas* elements because she is of Bosnian descent and suffered a material adverse employment action, termination. As for the second and fourth elements, Cackovic lacks evidence to overcome summary judgment.

With respect to the second element, Cackovic must establish that she was performing well enough to meet her employer's legitimate expectations. Cackovic does not dispute she violated HRH's company policies on February 17, 2012, by taking an unauthorized break in a guest room and not telling her supervisor. (SOF ¶¶ 52-54.) Instead, citing *Flores v. Preferred Technical Group*, 182 F.3d 512 (7th Cir. 1999), Cackovic argues that she does not have to show

she was meeting HRH's legitimate expectations when she violated that rule. In *Flores*, the plaintiff, a Hispanic woman, was singled out for discipline when she and several other employees protested a new policy. The Seventh Circuit held that since none of the other employees who broke the same rule as plaintiff were punished, it made "little sense" to discuss whether plaintiff was meeting her employer's reasonable expectations. *Id.* at 515. Unlike *Flores*, Cackovic is the only one accused of violating a company rule; she was not singled out from other housekeepers who violated the same rule of taking unauthorized breaks in guest rooms. Consequently, the situation in *Flores* is not analogous to Cackovic's case. As there is no dispute that Cackovic was not meeting HRH's legitimate expectations at the time she was fired, Cackovic has failed to meet this element. *See Zayas v. Rockford Mem. Hosp.*, 740 F.3d 1154, 1158 (7th Cir. 2014) (affirming grant of summary judgment and stating "[t]he question is not whether [plaintiff] ever satisfied the [defendant's] expectations, but whether she met the [defendant's] expectations at the time she was fired").

Likewise, with respect to the fourth element, Cackovic also has not shown that she was treated less favorably than other non-Bosnian employees. Cackovic cites only to her testimony that there was an African-American employee named Sabina who worked part-time, cleaned three rooms, and spent the rest of the time talking and drinking coffee with Baker. Cackovic, however, does not claim that Sabina, or any other housekeeper, was treated more favorably with respect to violating company policy and taking unauthorized breaks in guest rooms. Cackovic has failed to establish a *prima facie* case of discrimination based on her national origin, and, therefore, this claim fails as a matter of law.

Furthermore, even if Cackovic could meet her burden of establishing a *prima facie* case of discrimination, HRH has provided a legitimate non-discriminatory reason for firing her, *i.e.*,

violating company policy. Under the burden-shifting analysis, Cackovic must show this reason was pretextual. "[A] party establishes pretext with evidence that the employer's stated reason or the employment decision 'was a lie – not just an error, oddity, or oversight.'" *Teruggi v. CIT Group/Capital Fin., Inc.*, 709 F.3d 654, 661 (7th Cir. 2013) (quoting *Van Antwerp v. City of Peoria*, 627 F.3d 295, 298 (7th Cir. 2010)). None of Cackovic's evidence shows that HRH's stated reason for her termination was a lie. Cackovic argues that she can demonstrate pretext through Baker's actions; however, as discussed above, Izokaitis was the decision-maker who fired Cackovic, not Baker. Cackovic has failed to show that her termination was pretext for discrimination, and, therefore, her claim fails as a matter of law.

*Discrimination Based on Cackovic's Medical Disability*

Cackovic also claims that she was discriminated against and terminated in violation of the ADA. As with Title VII, Cackovic may establish a *prima facie* case for disability discrimination using either the direct or indirect method. *Dickerson*, 657 F.3d at 601. Cackovic has not presented any evidence of direct discrimination on the basis of her disability. To prove ADA disability discrimination indirectly, Cackovic must establish a *prima facie* case of discrimination and also show that: (1) she is disabled within the meaning of the ADA; (2) she is qualified to perform the essential functions of the job, either with or without a reasonable accommodation; and (3) she suffered from an adverse employment action as a result of her disability. *Hoppe v. Lewis Univ.*, 692 F.3d 833, 838-39 (7th Cir. 2012). HRH argues that Cackovic has not established a *prima facie* case of discrimination under the indirect method. HRH further argues summary judgment should be granted in its favor because Cackovic has not established that she is disabled.

16

The issue of whether Cackovic qualifies as disabled under the ADA does not need to be reached because Cackovic cannot establish a *prima facie* case of disability discrimination under the *McDonnell Douglas* elements. As discussed above, Cackovic cannot establish that she was meeting HRH's legitimate business expectations when she was terminated for violating company policies by taking an unauthorized break in a guest room and failing to advise her supervisor of taking a break.

Cackovic concedes that she violated company policy; she argues, however, that she violated company policy because of her diabetic condition and, that, therefore, her termination was disability discrimination. Cackovic states that Baker had afforded her extra breaks in the past, and argues that she was denied those same reasonable accommodations on February 17, 2012. Cackovic's argument is unpersuasive. Clearly, Cackovic's unauthorized break in a guest room on February 17, 2012 was different than in the past when Baker permitted Cackovic to take extra breaks during her shift outside of guest rooms. As set out above, *see infra* page six, Cackovic's own doctor's testimony contradicts Cackovic's stated reason for violating company policy. Dr. Lazarevic testified in his deposition that his notes from treating her the next day reflected only strong back pain; he also testified that she did not mention any problems at work and that if she had gone into a diabetic coma, she would not have been able to walk into his office the next day. (SOF ¶¶ 29, 31, 33.) Even if Cackovic's argument that her diabetic condition excuses her from violating HRH's company policy of prohibiting housekeepers from taking unauthorized breaks in guest rooms and lying about it was properly considered, it would not be dispositive. It is undisputed that Cackovic was not meeting her employer's legitimate expectations at the time of her termination, and therefore, Cackovic's disability discrimination claim fails as a matter of law. Likewise, as discussed above, Cackovic has failed to show that

HRH's stated reason for her termination was pretextual. Cackovic has not provided any evidence to support that Isokaitis's reasons for firing her were a lie and was meant to cover up disability discrimination. Consequently, Cackovic's disability discrimination claim fails as a matter of law. Summary judgment is granted in favor of HRH.

## CONCLUSION

For the reasons stated above, HRH's Motion for Summary Judgment [28] is granted. Civil case is terminated.

Date: June 26, 2014

JOHN W. DARRAH
United States District Court Judge